J-S40032-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.M.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.L.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2116 EDA 2023 |

Appeal from the Decree Entered July 19, 2023
In the Court of Common Pleas of Lehigh County Orphans' Court at No(s):
A2002-0107

BEFORE:   NICHOLS, J., SULLIVAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                **FILED MARCH 28, 2024**

C.L.B. ("Mother") appeals from the July 19, 2023 decree of the orphans' court terminating her parental rights to J.M.M. ("Child"), born in 2014.  We affirm.

This matter was initiated on December 13, 2022, when Child's father, J.M.M. ("Father"), and his wife, M.L.M. ("Stepmother"), filed a petition to involuntarily terminate Mother's parental rights pursuant to Section 2511(a)(1) and (b) of the Adoption Act. 23 Pa.C.S. § 2511(a)(1), (b).[1]  A

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] As required when one parent petitions to terminate the other parent's parental rights, the petition averred that Stepmother intended to adopt Child and that Father and Stepmother will assume custody of Child until the adoption is completed.  23 Pa.C.S. § 2512(b)(2); *In re Adoption of M.R.D.*, 145 A.3d 1117, 1120 (Pa. 2016); *see* Termination Petition, 12/13/22, ¶¶10-11.

hearing was held on the petition on July 13, 2023, at which Father, Stepmother, and Mother testified.[2]

The testimony at the hearing revealed that Father and Mother were married and residing together when Child was born. N.T., 7/13/23, at 56-57, 95. Child's older half-brother, J.B., who was born in 2011 to Mother and a prior partner, also resided in the marital home from the time of Child's birth until 2016, when Mother and Father separated. *Id.* at 9, 56-57. At some point later in 2016, Mother's live-in paramour came under investigation by the Lehigh County Office of Child and Youth Services related to injuries that an unrelated child sustained while under the paramour's care. *Id.* at 60-62. Mother then agreed to a safety plan to not allow Child or J.B., both of whom resided primarily with Father after the separation, to have contact with the paramour. *Id.* at 9, 27, 61-64. After it was alleged that Mother violated the safety plan, Father obtained sole legal and physical custody of Child. *Id.* at 60, 62.

While Mother was permitted to have supervised visitation with Child pursuant to a 2016 custody order, she only continued to visit Child until 2017

---

[2] Both Mother and Father were represented by counsel at the hearing. Child was represented at the hearing by a single attorney who represented his legal interests and best interests, as the court determined that there was no conflict between those interests. Order, 7/19/23, at 1 n.2; Order, 2/17/23, at 1; *see In re Adoption of K.M.G.*, 240 A.3d 1218, 1235-36 (Pa. 2020) (appellate court shall engage in *sua sponte* review to determine whether orphans' court appointed legal interests counsel for child and, where a single attorney was appointed to represent the child's legal and best interests, that the orphans' court made a determinate that those interests do not conflict).

when he was two or three years old. *Id.* at 93. In January 2018, a new custody order was entered providing that Father would continue to have sole legal and physical custody of Child, with Mother required to attend a coparenting class and engage in reunification counseling, at her expense, before she would be able to have any supervised or unsupervised custodial time with Child. *Id.* At 67-70.

Mother has not had any contact with Child since 2017. *Id.* At 93. Mother completed the court-ordered coparenting class but, to date, she has never found a reunification counselor who was affordable to her; therefore, no reunification was ever attempted. *Id.* At 70-75, 90-93. Mother asserted at the hearing that she tried to reach out to Father in the ensuing years through social media, by calling him, and by text message but her efforts were ignored. *Id.* At 76-77, 84. She also claimed that she sent birthday cards on several occasions to Child at Father's address, but these mailings were returned to sender. *Id.* At 77, 81-82, 84-85. Father admitted that he blocked Mother on social media but stated that he had had the same telephone number and email address since before the separation and he had received no telephone calls or any other forms of messages from Mother since that time. *Id.* at 10-11, 19-22. He also stated that, while he initially resided in a different apartment his apartment building than the one he currently lives in, he has resided in his current apartment for seven years, Mother's last visitation with Child occurred prior to Father moving out of the original apartment, Father's mother currently resides in his old apartment, and she delivers any mail to

him that he receives at his old address. *Id.* at 8-9, 18-19, 22, 24. Stepmother confirmed that she has never received any mail or any other communication from Mother concerning Child since she has been in a relationship with Father. *Id.* at 34-35.

Mother testified at the hearing that she ultimately gave up trying to maintain contact with Child at least three years prior to the termination hearing because her efforts seemed futile. *Id.* at 77, 84. She admitted that she had no knowledge of the facts of Child's life, including the names of his school, his doctors, or his friends. *Id.* at 86-89. Mother also described other difficulties in her life that she had to overcome since she had last seen Child, including becoming sober from heroin and painkillers in 2018 after a years' long addiction, finally separating from a toxic and abusive relationship with her paramour, and then having to find stable housing and employment after that relationship ended. *Id.* at 58-60, 64, 77-78, 86, 96, 99-100.

Stepmother and Father have been in a relationship since early 2020, and she moved in with Father at his current address in September 2022. *Id.* at 34, 36. The couple married in October 2022. *Id.* at 8, 36. In addition to Child, Mother's five-year-old son from a prior relationship and the couple's one-and-a-half-year-old son reside with them. *Id.* at 8, 25-26, 35, 41. Father also retained primary physical custody of J.B., Child's twelve-year-old half-brother and Mother's natural son, until he was ten years old. *Id.* at 27, 38, 42. Several years prior to the hearing, but after Stepmother had moved in with Father, J.B.'s custody arrangement was modified, and he began to reside

primarily with his natural father with Father retaining partial custody every other weekend. *Id.* at 27, 38, 42. In March 2023, J.B. informed the family that he did not wish to continue having weekend visits at Father's house, and J.B. had ceased being a part of Child's life as of that date. *Id.* at 27-28, 32, 37-38, 42-44. Stepmother and Father testified that Child has been in counseling since June 2021, based upon persistent behavioral issues, which were attributed in part to feelings of abandonment by Mother and J.B. *Id.* at 12-15, 26-29, 31-32, 39-40, 44-46.

Following the hearing, the orphans' court entered a decree terminating Mother's parental rights pursuant to Sections 2511(a)(1) and (b). Mother filed a timely appeal and a concurrent concise statement of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i). On August 24, 2023, the orphans' court filed an opinion pursuant to Pa.R.A.P. 1925(a).

Mother presents the following issue on appeal:

Did the [orphans'] court err in terminating Mother's parental rights when Father failed to meet his burden of proof by clear and convincing evidence that termination of [M]other's parental rights would best serve the needs and welfare of [C]hild under the Section 2511(b) of the Adoption Act?

Mother's Brief at 3.

We conduct our review in light of the following:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse

of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is on the petitioner in the lower court to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Under Section 2511 of the Adoption Act, the orphans' court must first determine whether the particular conduct of a parent warrants involuntary termination of his or her parental rights under any one of the eleven grounds enumerated in subsection (a). 23 Pa.C.S. § 2511(a)(1)-(11); *T.S.M.*, 71 A.3d at 267; *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021). If the orphans' court determines that the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. 23 Pa.C.S. § 2511(b); *T.S.M.*, 71 A.3d at 267.

Here, Appellees sought to terminate Mother's parental rights pursuant to Sections 2511(a)(1) and subsection (b). The statute provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
>> \*                    \*                    \*
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

In this appeal, Mother only challenges the orphans' court's finding that termination was appropriate under Section 2511(b), effectively conceding that Appellees met their burden under Section 2511(a)(1).[3] Section 2511(b)

_____

[3] Even if the issue were raised in this appeal, we would find that there was clear and convincing evidence to show that termination was appropriate under Section 2511(a)(1). This provision requires proof that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." *(Footnote Continued Next Page)*

- 7 -

requires the orphans' court to "give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." **T.S.M.**, 71 A.3d at 267 (citation and quotation marks omitted); **see also In the Interest of K.T.**, 296 A.3d 1085, 1106 (Pa. 2023). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." **K.T.**, 296 A.3d at 1105.

---

**C.M.**, 255 A.3d at 363-64 (citation omitted). The record contains abundant evidence that Mother made no affirmative effort to attend to Child's needs or maintain a parent-child relationship with Child for years prior to the filing of the termination petition, well in excess of the six-month statutory period. 23 Pa.C.S. § 2511(a)(1); **In re Adoption of L.A.K.**, 265 A.3d 580, 592 (Pa. 2021) (defining parental duties to include providing love, protection, guidance, and support in accordance with the child's needs and undertaking affirmative actions to develop and maintain the parent-child relationship). While Mother cited some difficulties in her life that affected her ability to perform parental duties for Child, these hurdles were insufficient to preclude her from playing any role in Child's life. **L.A.K.**, 265 A.3d at 592 ("The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.") (citations and quotation marks omitted). Moreover, while Mother attempted to resume playing a role in Child's life by filing a petition to modify custody the month prior to the termination hearing, N.T., 7/13/23, at 77, the Adoption Act forbids the orphans' court from considering "any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of" a petition filed pursuant to Section 2511(a)(1). 23 Pa.C.S. § 2511(b).

Our Supreme Court has consistently mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child." **T.S.M.**, 71 A.3d at 267 (citing **In re E.M.**, 620 A.2d 481, 485 (Pa. 1993)). Specifically, "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the child toward a permanent home." **Id**. at 253 (cleaned up). The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," causing the child to suffer "'extreme emotional consequences' or significant, irreparable harm." **K.T.**, 296 A.3d at 1109-10 (quoting **E.M.**, 620 A.2d at 484). "However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." **In re Adoption of A.H.**, 247 A.3d 439, 445 (Pa. Super. 2021) (citation omitted). "Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." **Id.** (citation omitted).

However, "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." **K.T.**, 296 A.3d at 1113; **see also id.** at 1113 n.28 (there is no "exhaustive list" of factors that must be considered by an orphans' court under Section 2511(b)). With respect to cases where a parent files a petition to terminate the rights of another parent, the petitioning parent must demonstrate that adoption is in the child's best interests and the orphans' court "must address and evaluate the 'proposed adoption' that was

- 9 -

averred in the termination petition."[4] ***In re E.M.I.***, 57 A.3d 1278, 1287 (Pa. Super. 2012). Overall, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." ***K.T.***, 296 A.3d at 1109.

The orphans' court found that, notwithstanding Child's feeling of abandonment, Child does not currently have an emotional bond with Mother. Decree, 7/19/23, at 4 n.3; Orphans' Court Opinion ("OCO"), 8/24/23, at 3-4. As support for its conclusion that no bond exists, the court cited the testimony of Father, Stepmother, and Mother to that effect as well as the fact that Child last saw Mother six years prior to the hearing, when he was two or three years old. Decree, 7/19/23, at 4 n.3; OCO at 3-4. The court accordingly determined that termination of Mother's parental rights would not destroy an existing necessary and beneficial relationship for Child. OCO at 3. The court added that Child "has already suffered harm from the destruction of the bond that occurred due to Mother's abandonment." ***Id.***

With respect to Stepmother's relationship with Child, the orphans' court found that

---

[4] The termination petition avers that a petition for Stepmother to adopt Child was pending in the orphans' court at the time of filing. ***See*** Termination Petition, 12/13/22, ¶10.

Stepmother has been a stable maternal presence in [Child's] life for the past three years. Father and Stepmother married in October of 2022 but have been living together since September of 2020. [Child] views Stepmother as a mother figure and calls her "Mom" or [by her first name.] She is fully involved in parenting [Child], taking care of his physical and emotional needs, arranging for medical and psychological care when needed, and attending to all of his schooling and extra-curricular activities. She treats him as if he were her own biological son, and he looks to her as if she were his mother. Continuity of that relationship in this stable, loving home will best serve [Child's] developmental, physical, and emotional needs and welfare. Accordingly, [the lower court concluded that] the termination of Mother's parental rights is in [Child's] best interest so that the [orphans' c]ourt can give legal effect to the relationship that already exists in fact between [Child] and Stepmother.

Decree, 7/19/23, at 4 n.3; **see also** OCO at 3-4. The court found that Stepmother's testimony was credible, "palpably authentic[,] and nurturing." OCO at 3. The court determined that Stepmother "demonstrated clearly and convincingly that she meets [Child's] intangible needs of stability, security, love, comfort, and nurture in addition to meeting his tangible needs on a daily basis." OCO at 3. The court added that

[C]hild has developed a positive attachment to Stepmother, who has fulfilled a true parental role for the past several years and who eagerly awaits the opportunity to give him permanence by adopting him. The strong, positive bond he has with [S]tepmother is worth preserving over the vague memory he has of Mother.

**Id.** at 4.

Mother argues that the evidence was insufficient to support the orphans' court's finding that termination was appropriate under Section 2511(b) where the testimony cited by the court was "solely from two self-interested parties," Father and Stepmother, and neither Child nor his therapist were examined.

- 11 -

Mother's Brief at 11. Mother contends that the petitioners did not present evidence showing that terminating Mother's parental rights would benefit Child, and in fact their testimony was "in direct conflict" with the court's conclusion that termination best served Child's needs and welfare as there was ample testimony that Child was in counseling and dealing with abandonment issues related to Mother. *Id.* at 12. Mother maintains that, in light of the fact that Child was still "struggling to understand his emotions and relationships in a unique family dynamic, . . . additional evidence and testimony is imperative to truly understand[] what bond [C]hild has with Mother." *Id.* at 13.

We conclude that the orphans' court did not abuse its discretion or commit an error of law in finding that termination of Mother's parental rights under Section 2511(b) was warranted. First, to the extent Mother argues that Father and Stepmother should have presented Child's therapist, we note that a petitioner is not required to offer expert testimony regarding the bond between the parent and child, and Section 2511(b) does not require a formal bonding evaluation. *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018); *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Furthermore, "in involuntary termination proceedings, the testimony of the child is not a requisite part of the inquiry, which focuses entirely on the parenting capacity of the parent." *In re B.J.Z.*, 207 A.3d 914, 920 (Pa. Super. 2019) (quoting *In re B.L.L.*, 787 A.2d 1007, 1016 (Pa. Super. 2001)). Moreover, Mother has cited no caselaw, statute, or rule that would require a

petitioner in a termination of parental rights case to present at least one impartial witness in order to prevail, and our research uncovers no authority for such a position. Accordingly, the orphans' court did not err in granting the termination petition where only the petitioning biological parent and prospective adoptive stepparent testified in support of the petition.

Additionally, the orphans' court's finding that no bond exists between Mother and Child is supported by competent evidence. Child's last visit with Mother was in 2017, when he was two or three years old, and Child has not received a letter, card, telephone call, or other message, from her since. N.T., 7/13/23, at 10-11, 19-22, 34-35, 93. Both Father and Stepmother testified that there was no relationship between Child and Mother, and Mother confirmed in her own testimony that she currently has no bond with Child. *Id.* at 12 (Father testifying that Child and Mother "have no relationship at all" and "[n]o bond at all"); *id.* at 40 (Stepmother testifying that Child "can't even put a face to" Mother, "has no -- nothing -- no memory" of her," and knows "[n]othing of her"); *id.* at 81 (Mother testifying that "if given the opportunity, I would like to form some type of relationship [with Child] through reunification"); *id.* at 89 (Mother stating, in response to a question on cross-examination "[y]ou don't have any bond with [Child] now, do you?", "[t]hat's why I'm here because I would like to have a bond with my son"). Since the evidence supported the orphans' court's finding of no bond between Mother and Child, the court was not required to proceed further with a bond analysis. *K.T.*, 296 A.3d at 1106 ("if the child has any bond with the biological parent,

the court must conduct an analysis of that bond"); **A.H.**, 247 A.3d at 445 (stating that where there is no evidence of a bond, it is reasonable to infer that no bond exists and "the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case").

As Mother points out, the record at the termination hearing showed that Child felt abandoned by Mother and by the more recent decision by Child's maternal stepbrother, J.B., to cut off contact with Child; Child suffered from angry outbursts as a result; and Child has been in counseling sessions related to his sense of abandonment since June 2021.  N.T., 7/13/23, at 12-15, 26-29, 31-32, 39-40, 44-46.[5]  However, this evidence does not show that any type of bond—whether necessary and beneficial or unhealthy and detrimental to Child—exists; instead, it only demonstrates Child's difficulty in emotionally processing the complete absence of a parental figure from his life for the six years prior to the hearing.  Therefore, we disagree with Mother that the evidence of Child's feeling of abandonment undermined the orphans' court's finding that no bond existed and that Child's needs and welfare were best served through termination of Mother's parental rights.

_____

[5] Father testified that Child felt abandoned by Mother and that Child "feels pretty angry that he was left behind" by her.  N.T., 7/13/23, at 12-13, 15. Stepmother testified that Child "feels that he's not good enough for either [Mother or J.B.] to not be in his life" and "[h]e doesn't understand why they don't want to be in his life." **Id.** at 39.  Stepmother further explained that one of the few times that Child would bring up Mother was as a result of J.B. "tell[ing Child] things about his mother that [J.B.] was told at his biological father's house." **Id.** at 40.

Finally, although Mother does not argue to the contrary in this appeal, we note that the record amply supports the orphans' court's finding that Child's continuity in the home with Father and Stepmother and Stepmother's prospective adoption of Child was consistent with his developmental, physical, and emotional needs and welfare.[6] As the record supports the orphans' court's decision to terminate Mother's parental rights to Child and Mother has not demonstrated any abuse of discretion or error of law by the lower court, we affirm the July 19, 2023 decree.

Decree affirmed.

_____

[6] The testimony at the hearing showed that Father is employed full-time, while Stepmother is a stay-at-home parent taking care of the household, including Child and the couple's other two children. N.T., 7/13/23, at 14, 30, 34-35, 37. Stepmother estimated that she is responsible for approximately 75-80% of Child's care, and she has primary responsibility for taking Child to doctor's appointments and attending his school events and parent-teacher conferences. *Id.* at 37, 46-47. While Child initially referred to Stepmother more by her first name during the early part of their relationship, he has referred to Stepmother more and more as "mom" over time. *Id.* at 26, 49. Child is doing very well at school and receives excellent grades. *Id.* at 29-30, 46. Father and Stepmother also support Child by having him attend counseling sessions, which have benefited Child substantially and greatly diminished the frequency of his outbursts. *Id.* at 28, 44-46.

With regard to Stepmother's potential adoption of Child, she testified that she treats Child as her own son, loves him unconditionally, and plans to continue to do so regardless of whether the adoption proceeds. *Id.* at 47, 49 ("I've explained to [Child] that this changes nothing. I will always love you[,] be there for you[, and] provide for you."). However, she stated that "[i]t would mean the world" to be able to adopt Child and their family would then "be complete." *Id.* at 47. Stepmother continued that she believed that Child "would be so happy and excited that he has a mother in his life that loves him unconditionally [and would] do anything for him." *Id.* Stepmother stated that she described the proceedings to him in terms that he would understand and Child "was very happy that this was going to take place." *Id.* at 48.

Decree affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/28/2024